## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **REGINA DAVIS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:11cv00065 |
| | ) | |
| | ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits.

## *I. Background and Standard of Review*

Plaintiff, Regina Davis, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

- 1 -

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Davis protectively filed her application for SSI on August 4, 2008, alleging disability as of August 6, 2008,[1] due to fibromyalgia, facial pain syndrome, restless leg syndrome, osteoporosis, depression, migraine headaches and nerve damage in her back. (Record, ("R."), at 118-22, 135, 139, 190.) The claims were denied initially and on reconsideration. (R. at 59-61, 64-65, 68-69.) Davis then requested a hearing before an administrative law judge, ("ALJ"). (R. at 74.) The hearing was held on January 7, 2010, at which Davis was represented by counsel. (R. at 330-80.)

By decision dated January 29, 2010, the ALJ denied Davis's claim. (R. at 14-28.) The ALJ found that Davis had not engaged in substantial gainful activity since August 6, 2008, the date of her application. (R. at 16.) The ALJ determined that the medical evidence established that Davis suffered from severe impairments, including bilateral carpal tunnel syndrome, status post release surgeries, degenerative disc disease of the lumbar spine and fibromyalgia, but he found that

---

[1] Davis originally alleged an onset date of disability of April 30, 2006. (R. at 118, 135). However, at her hearing, she amended her alleged onset date of disability to August 6, 2008. (R. at 14, 337.)

Davis did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-21.) The ALJ found that Davis had the residual functional capacity to perform light work[2] that did not involve sustained, continuous, precision fingering, feeling or handling with both hands, that required no more than frequent stooping, bending, crawling, crouching, kneeling, balancing and climbing ramps or stairs and that did not require climbing of ladders, ropes or scaffolds or exposure to unprotected heights. (R. at 21.) The ALJ found that Davis was able to perform her past relevant work as a cashier/checker. (R. at 26.) Based on Davis's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Davis could perform jobs existing in significant numbers in the national economy, including light and unskilled jobs as a cafeteria attendant, a bagger and a cleaner/housekeeper, as well as sedentary[3] jobs as an order clerk, a call out operator and a charge account clerk. (R. at 26-27.) Therefore, the ALJ found that Davis was not under a disability as defined under the Act and was not eligible for benefits. (R. at 27-28.) *See* 20 C.F.R. § 416.920(f), (g) (2011).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2011).

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 416.967(a) (2011). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a) (2011).

After the ALJ issued his decision, Davis pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 6-9.) Davis then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2011). The case is before this court on the Commissioner's motion for summary judgment filed June 12, 2012.[4]

## II. Facts

Davis was born in 1961, (R. at 29, 118, 135, 338), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 416.963(c). Davis completed the eleventh grade of high school and has training as a certified nurse's assistant, ("CNA"). (R. at 144, 338.) She has past relevant work as a cashier/clerk and a CNA. (R. at 140, 340-42.)

Dr. H.C. Alexander, III, a medical expert, was present and testified at Davis's hearing. (R. at 355-63.) Dr. Alexander stated that the record showed that Davis's medically determinable physical impairments were degenerative disc disease in the low back, fibromyalgia and carpal tunnel syndrome. (R. at 358-59.) He stated that Davis had the residual functional capacity for a modified range of light work. (R. at 359-62.) In comparing his assessment with that of the state agency physicians, he explained that Davis would be unable to climb ladders, ropes or scaffolds, but because she had no lower extremity or weight-bearing joint impairments, she could perform all other postural movements frequently. (R. at 359-60.) He opined that Davis would be unable to perform sustained, or

---

[4] Davis did not file a motion for summary judgment in this case.

continuous, fine manipulation as in precision assembly; could perform manipulative movements, such as handling change; and must avoid exposure to unprotected heights. (R. at 361-62.) Dr. Alexander stated that Davis's impairments did not meet or equal a listed impairment. (R. at 363.)

Michael Gore, a vocational expert, also was present and testified at Davis's hearing. (R. at 364-79.) Gore was asked to assume a hypothetical individual of Davis's age, education and work experience who had the residual functional capacity to perform light work that did not require climbing ladders, ropes or scaffolds or continuous use of her upper extremities or precision fingering or feeling and that did not require exposure to unprotected heights. (R. at 366-67.) Gore testified that such an individual could perform Davis's past work as a cashier/checker. (R. at 367.) Gore also testified that such an individual could perform the light jobs of a cafeteria attendant, a bagger and a cleaner in housekeeping. (R. at 367-69.) He also identified sedentary jobs that such an individual could perform, including jobs as an order clerk, a call-out operator and a charge account clerk. (R. at 369-70.) When asked to consider the same individual, but who would have difficulty interacting with the public, Gore stated that Davis's past work as a cashier/checker would be eliminated, as well as the identified sedentary jobs. (R. at 370-71.) However, he testified that such an individual could perform the sedentary jobs of unskilled surveillance system monitor and unskilled production laborer/inspector. (R. at 371-73.) Gore was then asked to consider the same individual who was limited as indicated by the assessment of Mari Sullivan-Walker, M.A., a licensed psychologist. (R. at 312-13, 374.) He stated that there would be no jobs available that such an individual could perform. (R. at 374.)

In rendering his decision, the ALJ reviewed records from Dr. Thomas E. Brinegar, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Bluefield Regional Medical Center; Dr. Syed M. Ahmad, M.D., a rheumatologist; Princeton Community Hospital; Elaine Harper, A.N.P., an adult nurse practitioner; Community Radiology; Dr. Abed Koja, M.D., a neurosurgeon; Cumberland Mountain Community Services; and Mari Sullivan-Walker, M.A., a licensed psychologist.

Davis has a history of complaints of pain in her hands, elbows, shoulders, ankles, back and feet since 2006. (R. at 204-05, 243.) In December 2006, x-rays of her left elbow were normal. (R. at 243.) In January 2007, an MRI of Davis's left elbow showed what appeared to be compatible with "tennis elbow." (R. at 242.) In May 2007, x-rays of Davis's left elbow showed minimal soft tissue fullness over the posterior aspect of the ulna possibly nonspecific soft tissue swelling or olecranon bursitis. (R. at 205.) X-rays of Davis's right ankle and left hand were normal. (R. at 217-18.) In August 2007, an x-ray of Davis's lumbosacral spine suggested facet joint arthropathy. (R. at 216.)

On August 20, 2007, Dr. Syed M. Ahmad, M.D., a rheumatologist, evaluated Davis for complaints of musculoskeletal pain. (R. at 230-32.) Davis's neurological examination was grossly intact, although a Phalen's test was positive in the right hand. (R. at 231.) A musculoskeletal examination showed tender points secondary to fibromyalgia, but adequate range of motion of the hands, shoulders, ankles and feet. (R. at 321.) Lumbar range of motion was normal, although with

some pain. (R. at 231.) Dr. Ahmad diagnosed chronic fibromyalgia and fibrositis syndrome, polytendonitis, carpal tunnel syndrome, recurrent migraine headaches, depression and anxiety. (R. at 231.) On September 17, 2007, Davis reported that her aches and pains from fibromyalgia and fibrositis syndrome were somewhat better. (R. at 228.) She had no new major joint swellings or progressive joint deformities, although she reported pain in the peripheral joints, as well as the neck and back. (R. at 228.) Dr. Ahmad reported that Davis's neurological examination was intact with the exception of a positive Phalen's test. (R. at 228.) She had no peripheral joint swelling, and range of motion was adequate, but tender. (R. at 228.) A nerve conduction study showed bilateral carpal tunnel syndrome. (R. at 211.) Davis underwent right carpal tunnel release surgery in September 2007. (R. at 212-13.)

On February 7, 2008, Davis reported that Lortab had helped her pain symptoms. (R. at 227.) She reported that she had not been "exercising much" and that her lifestyle was quite sedentary. (R. at 227.) Dr. Ahmad noted that Davis's mood was fairly stable and that she appeared "somewhat nervous." (R. at 227.) She had no muscle weakness. (R. at 227.) Her cervical and lumbar spine mobility was adequate, but her lower back was tender. (R. at 227.) Dr. Ahmad suggested that Davis exercise regularly. (R. at 227.) On February 28, 2008, Davis reported that her aches and pains had not improved and she felt more depressed. (R. at 226.) A neurological examination was normal. (R. at 226.) She had soreness in her muscles, but no weakness. (R. at 226.) Her cervical and lumbar spine mobility was adequate, although painful. (R. at 226.) A straight leg raising test was negative. (R. at 226.) Dr. Ahmad encouraged Davis to join a wellness center and engage in

weight-bearing aerobic exercise. (R. at 226.) Davis declined physical therapy, but reported that her restless leg symptoms had improved on medication. (R. at 226.)

On April 10, 2008, Davis reported that her aches and pains were somewhat better. (R. at 225.) She had no major joint swelling or new joint deformities, and her muscles, joints and back were achy, but "somewhat better." (R. at 225.) Her mood was "not … as depressed," and her migraine headaches were stable. (R. at 225.) Dr. Ahmad stressed conservative treatment and referred her for physical therapy. (R. at 225.) On June 10, 2008, Davis reported that her medication seemed to help her to a certain extent. (R. at 223.) Dr. Ahmad opined that Davis's low back pain was probably related to chronic sprain, degenerative joint disease and a sedentary lifestyle with deconditioning. (R. at 223.) Her mood was "fairly stable" on medication. (R. at 223.) Range of motion of various joints was adequate though tender. (R. at 223.) Dr. Ahmad recommended that Davis engage in regular exercise programs. (R. at 223.) Davis underwent successful carpal tunnel release surgery on her left hand on June 26, 2008. (R. at 235-38.) On June 13, 2009, an MRI of Davis's lumbar spine showed disc dehydration at the L4-L5 and L5-S1 levels, facet joint arthrosis at the L3-S1 levels, moderate bulging annulus fibrosus at the L5-S1 level without significant neural encroachment and no evidence of herniated nucleus pulposus, spinal stenosis or other abnormality. (R. at 241.)

On September 26, 2008, Davis presented to the emergency room at Bluefield Regional Medical Center with a complaint of headaches. (R. at 294-95.) She was alert and oriented. (R. at 295.) No anxiety or depression was noted. (R. at 295.) Memory was intact. (R. at 295.) Musculoskeletal examination showed mild tenderness to palpation in the cervical spine. (R. at 295.) She was diagnosed with a

migraine headache. (R. at 295.) On July 9, 2009, she again presented to the emergency room with complaints of migraine headaches. (R. at 301-05.) A CT scan of her head showed chronic left sphenoid sinusitis. (R. at 301.) She was diagnosed with migraine headaches and sinusitis. (R. at 305.)

On January 8, 2009, Louis Perrott, Ph.D., a state agency psychologist, reported that Davis suffered from an affective disorder and an anxiety-related disorder. (R. at 33, 35.) He noted that Davis had no restrictions on performing her activities of daily living and experienced no difficulty in maintaining social functioning. (R. at 33.) Perrott reported that Davis had mild limitations in her ability to maintain concentration, persistence or pace and that she had not experienced any episodes of decompensation. (R. at 33.)

On January 9, 2009, Dr. Frank M. Johnson, M.D., a state agency physician, reported that Davis had the residual functional capacity to perform light work with a right hand limitation. (R. at 34, 39.) He also noted that Davis could frequently climb ramps and stairs, balance, stoop and kneel and occasionally climb ladders, ropes and scaffolds, crouch and crawl. (R. at 37.) Dr. Johnson reported that Davis's ability for fine manipulation was limited in her right hand. (R. at 38.)

On April 8, 2009, Davis saw Elaine Harper, A.N.P., an adult nurse practitioner, with complaints of depression, family stressors, difficulty falling asleep, weight gain, restless leg syndrome, joint pain and stiffness, fatigue and left hip pain. (R. at 236-38.) Harper reported that Davis was alert and oriented, but her affect was flat and depressed. (R. at 237.) Harper diagnosed fibromyalgia,

osteoporosis, depression and restless leg syndrome. (R. at 237.) Harper recommended that Davis exercise regularly. (R. at 237.)

On April 23, 2009, Julie Jennings, Ph.D., a state agency psychologist, reported that Davis suffered from an affective disorder and an anxiety-related disorder. (R. at 49-50.) She noted that Davis had mild restrictions on performing her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 50.) Jennings reported that Davis had not experienced any episodes of decompensation. (R. at 50.)

On April 23, 2009, Dr. Richard Surrusco, M.D., a state agency physician, reported that Davis had the residual functional capacity to perform light work that allowed her to frequently climb ramps and stairs, balance, stoop and kneel and occasionally climb ladders, ropes and scaffolds, crouch and crawl. (R. at 52-53.) Dr. Surrusco reported that Davis's ability for fine manipulation was limited in her right hand. (R. at 53.)

On May 26, 2009, Davis was seen at Cumberland Mountain Community Services by Katie Buchanan, M.S. (R. at 247-49.) Davis reported having a difficult week due to multiple stressors, including the remodeling of her home; having to clean up after her daughter's boyfriend, who lived with them; worrying about her daughter's boyfriend taking advantage of her daughter; and her son being deployed to South Korea. (R. at 247.) Davis's mood was depressed and anxious. (R. at 247.) Her memory and concentration were intact, and her insight and judgment were described as good. (R. at 248.) On June 9, 2009, Davis presented with a calmer affect. (R. at 250-52.) She reported a stressful week with her daughter-in-law, who

was visiting. (R. at 250.) Buchanan reported that Davis's affect was appropriate, and her mood depressed. (R. at 250.) Davis's memory and concentration were intact. (R. at 251.) On June 23, 2009, Davis's affect was brighter. (R. at 253-55.) Davis's major complaint was ongoing physical pain. (R. at 253.) Davis reported some irritability, insomnia and poor concentration, secondary to chronic back pain. (R. at 254.) Davis reported being under stress from caring for her family members. (R. at 253.) Her mood was stable, and it was noted that Davis had regained her normal coping skills. (R. at 253.) Davis's memory was intact, but her concentration was impaired secondary to chronic back pain. (R. at 254.) Buchanan reported that Davis had completed the planned treatment and that her prognosis was deemed "fair." (R. at 256.) Buchanan assessed Davis's then-current Global Assessment of Functioning score, ("GAF"),[5] at 64.[6] (R. at 256.)

On July 31, 2009, Dr. Abed Koja, M.D., a neurosurgeon, evaluated Davis for low back and leg pain. (R. at 244.) A straight leg raising test was positive, but the remainder of the neurological examination was generally intact. (R. at 244.) Dr. Koja opined that Davis's MRI results were consistent with degenerative disease and recommended conservative treatment. (R. at 244.) Dr. Koja diagnosed lumbar spondylosis with radiculopathy. (R. at 245.) Davis underwent two epidural blocks in August 2009, with no improvement. (R. at 257-59.) A lumbar myelogram and

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

CT scan of Davis's lumbar spine were both normal.[7] (R. at 260-62.) On September 25, 2009, Dr. Koja reported that Davis's neurological examination was intact. (R. at 263.) Dr. Koja stated that as far as Davis's back and neck pain was concerned, there was nothing more that he could do. (R. at 263.)

On December 17, 2009, Mari Sullivan-Walker, M.A., a licensed psychologist, evaluated Davis at the request of Davis's attorney. (R. at 307-11.) Davis reported that she believed people were against her and that people talked about and laughed at her. (R. at 309.) She reported that she experienced auditory hallucinations, including voices and random noises. (R. at 309.) Walker reported that Davis's insight and judgment were severely deficient. (R. at 309.) Davis's immediate and remote memory was intact, but her recent memory was impaired. (R. at 309.) Sullivan-Walker reported that Davis's ability to concentrate was severely deficient. (R. at 309.) The Beck Anxiety Inventory, ("BAI"), and the Beck Depression Inventory, Second Edition, ("BDI-2"), indicated that Davis suffered from severe anxiety and depression. (R. at 310.) Sullivan-Walker diagnosed recurrent, severe major depressive disorder with psychotic features, generalized anxiety disorder, panic disorder with agoraphobia and dyssomnia, not otherwise specified. (R. at 311.) She assessed Davis's then-current GAF score at 40.[8] (R. at 311.) Sullivan-Walker stated that Davis would be unable to sustain steady, gainful employment of even the light or sedentary type. (R. at 311.)

---

[7] Davis presented to the emergency room on September 22 and 24, 2009, with complaints of headaches and vomiting. (R. at 267-84.) She was diagnosed with post mylegram headache and facial hemiplegia. (R. at 271, 278.)

[8] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood ...." DSM-IV at 32.

Sullivan-Walker completed a mental assessment indicating that Davis was moderately limited in her ability to understand and remember very short and simple instructions, to ask simple questions or request assistance and to be aware of normal hazards and to take appropriate precautions. (R. at 312-13.) She also indicated that Davis was markedly limited in her ability to remember locations and work-like procedures; to understand, remember and carry out detailed instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 312-13.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62

(1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Davis argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Memorandum Of Law In Support Of Motion For Summary Judgment,[9] ("Plaintiff's Brief"), at 7-10.) She also argues that the ALJ erred by failing to accord any weight to the assessment and conclusions of psychologist Sullivan-Walker. (Plaintiff's Brief at 7-10.) Davis further argues that the ALJ erred by failing to find her testimony regarding her pain not credible. (Plaintiff's Brief at 10-11.)

---

[9] As noted above, Davis did not file a motion for summary judgment in this matter.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Davis argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 7-10.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 416.921(a) (2011). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling,

- 15 -

seeing, hearing, speaking, understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 416.921(b) (2011). The Fourth Circuit held in *Evans v. Heckler,* that ""'[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.''" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

Based on my review of the record, I find that substantial evidence does not exist in the record to support the ALJ's finding that Davis did not suffer from a severe mental impairment. The ALJ noted that he was giving the state agency psychologists' opinions greater weight in making his determination that Davis did not suffer from a severe mental impairment. (R. at 25.) The ALJ also noted that he gave no weight to the opinion of Sullivan-Walker because it was inconsistent with the other evidence of record. (R. at 19.) To the contrary, the record shows that Davis has suffered with depression since 2008. (R. at 227.) The record does show that Davis's mood was fairly stable and the state agency psychologists opined that Davis had only mild limitations in her ability to maintain concentration, persistence or pace. (R. at 33, 50.) Davis also was treated for depression and anxiety at Cumberland Mountain in May and June 2009. (R. at 247-56.) Although her mood was considered stable, it was noted that her ability to concentrate was impaired secondary to chronic back pain. (R. at 254.) Sullivan-Walker also found that Davis was severely deficient in her ability to concentrate and that she was markedly to moderately limited in her ability to perform work-related mental

- 16 -

activities. (R. at 312-13.) Testing also showed that Davis suffered from severe anxiety and depression. (R. at 310.) Davis was not seen at Cumberland Mountain or by Sullivan-Walker until after the state agency psychologists reviewed the record. Thus, the state agency psychologists did not have these reports to consider prior to making their decisions.

Therefore, for the foregoing reasons, I cannot find that substantial evidence exists to support the ALJ's finding that Davis did not suffer from a severe mental impairment or his weighing of the medical evidence.

## IV. Conclusion

For all of the reasons stated above, I cannot find that substantial evidence exists to support the ALJ's findings, and I deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand this case to the Commissioner for further consideration.

An appropriate order will be entered.

DATED:     July 3, 2012.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

- 17 -